We're here today to hear the case of United States v. Lezmond Mitchell. Each side has 30 minutes. If you want to reserve some time for rebuttal, please watch the clock. Counsel? Good afternoon, Your Honors. May it please the Court. Deputy Federal Public Defender Jonathan Amanoff on behalf of Lezmond Mitchell. I'm joined by my co-counsel, Celeste Bakke, who's off the screen. I do intend to reserve five minutes, and I'll do my best to keep an eye on the clock. Your Honors, obviously this is an emergency appeal. Mr. Mitchell is scheduled to be executed eight days from today. The issue before the Court is just one real issue, Your Honors. And the question is what the District Court meant when it sentenced Mr. Mitchell and wrote in the January 2004 judgment that the Attorney General shall release the defendant to the custody of the U.S. Marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State of Arizona. This language tracks almost exactly Section 3596 of the Federal Death Penalty Act. My intention this afternoon is to speak about the statutory text of Section 3596. I'd like to then touch on the history and the consequences of the particular language used. And after that, I do plan to spend some time talking about the District of Columbia's opinion in the protocol cases that we relied on quite heavily below. Mr. Amanoff, before you get onto the statutory interpretation issue, I just want to be clear what relief you're seeking. If Mr. Voigt stood up and said, we will follow Arizona Order 710 in conducting this execution, would the relief you're seeking have been obtained? Your Honor, it wouldn't. I think we would need to set a new execution date, and here's why. Put aside how long it takes to do that. My question is, if the United States said we will conduct this execution, and I mean the execution, the mechanism of causing your client's death as opposed to how many witnesses are there, if the United States were doing that, would you have a complaint today? I would want to know the granular level of detail, Your Honor, and I'm not trying to avoid your question. So tell me in what respects you believe the United States will deviate from whatever Arizona law is, take the most charitable assumption, in conducting your client's execution. And again, assume for purposes of my question, I'm not worried about how many witnesses there are and how long before the execution the lawyers must leave. Thinking about conducting the execution, what ways will the United States depart from Arizona law in conducting your client's execution? So in my view, they've already departed from Arizona law, and the first way that they have done that is by failing to give us notice of whether these drugs are compounded drugs. And so under Arizona law, and we've filed the protocol, it's on page 2 of the protocol, we're supposed to get notice within 10 days of seeking the warrant of whether the drugs are going to be compounded drugs or non-compounded drugs. Did you, Mitchell, did you request notice of that? It says, a quantitative analysis of any compounded or non-compounded chemicals shall be provided upon request. So was a request made? No, Your Honor, but I was not actually speaking about that provision. There's an earlier provision that says, the decision to use a compounded or non-compounded chemical will be provided to the inmate and their counsel of record in writing at the time the state files a request for warrant of execution in the Arizona Supreme Court. So under that provision, we are not required to request anything. It's up to them to give us notice themselves. Well, Mr. Amanoff, maybe we're missing each other on this question. I'm thinking now about the day of the execution. Oh, okay. How is the execution going to be conducted? Put aside notices and everything else. How do you believe the execution will be conducted by the Bureau of Prisons in a way that deviates from the law prescribed by the state of Arizona? And we can then get back to what that law is, but I just want to figure out first what your contentions are. Okay, so there's a few different answers. To start with, I think there's a lot of mystery as to how these executions... I'm not asking about mystery. You're seeking an injunction. So you're seeking an injunction. We're not here as an APA case. We're trying to figure out, your client has a right under the statute to be executed in the manner prescribed by the law of Arizona. My question is still, tell me in what ways you believe he will be executed in a way that departs from the law of Arizona. And again, focus on the mechanisms of the execution, not previous notice, et cetera. I think it's fully possible that the Bureau of Prisons will use expired drugs on Mr. Mitchell. I think it's very likely that they will use unlicensed professionals to insert the catheters into Mr. Mitchell. Those for starters. The intravenous access differs between the two protocols. Ways in which the drugs are actually administered. Under Arizona law, there is a requirement of a saline flush, whereas the saline flush in the federal protocol comes after both syringes are administered. Can we take things one at a time? Yes, sure, Your Honor. As to the first thing you said, you think it's likely... I may be paraphrasing, but you're concerned that expired drugs will be used? Yes, Your Honor. And of course, we're all aware about the March 10, 2020 general guidelines, the federal guidelines. Is there some reason to think the federal government is not going to follow that part of the protocol? Your Honor, I have reason to believe that they didn't in the past, and I'm happy to file exhibits on that that are not yet before the court. What have we got? We have to look at the likelihood. You're looking for a stay. We have to look for the likelihood that this harm will occur. And the harm, I think, as Hurwitz indicated, is the deviation. Is there a delta? And I'm going to ask you whether there's a meaningful delta between what I will call loosely the federal protocol and the state protocol. And the first thing you've identified, to just sort of cut to the chase, is that expired drugs may be used. But I don't see anything in the record that we have that tells us that the event is showing that that is likely to occur. Do I miss it? Have I missed it? And part of the problem here is that this issue has not been fully briefed before this court yet. We're working in part off of a fairly extensive record in the District of Columbia, but so far we're here just on a preliminary injunction motion, and there hasn't been any evidentiary development at this point. So I'm relying in part on depositions that have been taken in a separate case that, unfortunately, right now are under seal. But there is fairly extensive evidence that confirms exactly what I'm saying. Doesn't the federal protocol require that the drug be tested for efficacy? It does, Your Honor. Before we get to that, excuse me, before we leave this, if I could, just the expiration date, if we were to enter an order requiring that the March 10, 2020, general guidelines are complied with, that is the federal guideline regarding expiration date, then would you have a problem with this first component? So if Your Honor entered an order specifically instructing the Bureau of Prisons to follow that portion of the Arizona protocol, was that the question? Right. Not to use expired drugs. Right. I think that would be a start. Well, counsel, you got to... I think... Would that eliminate the concern? And I really need a... I'm concerned that I need to get your answer to that question, please. If the court specifically ordered the government not to use expired drugs, it would certainly help with my concern that they might use expired drugs. I can say that. Well, it would eliminate your concern that they might use expired drugs, would it not? In the absence of some evidence that they disobeyed the order, we would have solved that problem. I mean, yes, Your Honor, that's true. I mean, I would hope they would follow the court's order, yes. Okay, so let's move on to the second. The court is trying to move on to the second point. Yes, I mean, I think part of the problem here, Your Honor, is this protocol is very bare bones, and this is the exact problem that this court has dealt with several times in Arizona. When protocols have been changed, they are completely nonspecific. And as an aside, Mr. Emmerhoff, as a veteran of the Arizona experiences... Yes, Your Honor. The last thing your client wants is the Arizona experience, even though that's what the statute entitles him to. Your Honor, I... It has been, as you know from talking to your colleagues, botched here two of the last three times. Yes, Your Honor. But that's a separate issue. I don't think it is. The second point is unlicensed personnel. So let me follow Judge Christen's question. What if we were to order the Bureau of Prisons to have Venus Lines placed by only people who are licensed to do so in the United States? I think that's a good idea, Your Honor. I think the court... It's really a good idea. It eliminates that point of contention, doesn't it? Yes, Your Honor. If the court wants to specifically order the Bureau of Prisons to follow all of Arizona's protocols that directly relate to how this execution is going to happen, that is exactly what should have happened in the first place. Okay. If we do that, I want to go through your four points. I think Judge Christen may have cut her off. She did what she was doing. If we do that, then what is your complaint? I think if the court specifically ordered that the Arizona protocol be followed, then we wouldn't have a complaint. That's not where we are right now. So if we order that the protocol be followed, and I think that we need to start with the notice that they need to give us when they seek the execution... No, no. Now you're making it... I'm just asking about these four things because at least I can tell you from my perspective what the matter of implementation, the matter of execution is, is the actual conduct of the procedure that causes the death of your client and not notices beforehand, et cetera. So maybe... I only speak from my preliminary view on that, but I'm just trying to focus on these four things. I'm having... Tell me the difference... Tell me the... Okay, go ahead, Judge Christen. I'm sorry. As to the expiration, I don't think there is a difference. But I'm not suggesting we would enter an order requiring compliance with the Arizona protocol. What I'm trying to do first is determine whether your position that any deviation from the Arizona protocol is sufficient to satisfy your burden. Is that your position? That's my starting point, Your Honor. I think, at the very least, anything that relates exactly to the execution itself. So I can understand the argument that maybe for witnesses that wouldn't be included. Okay, wait a minute. I'm not going to witnesses. We're just talking about the four points. Okay, then yes, Your Honor. I was talking about expiration of the compound, so let's set that aside. If we go on to the second point, which Judge Hurwitz was just following up on, if we're talking about certification of the folks who placed the IV line, is it your position that the Arizona requirement on that point is more protective? Yes, Your Honor. Can you give me an example of someone who would satisfy the federal protocol on that point and not satisfy the state protocol, please? Yes, Your Honor. I think the federal protocol just requires someone with a medical certification. So, for example, let's say a nurse that has worked in a rehabilitation center for years and hasn't inserted a line into someone as opposed to a licensed person who is specifically qualified and licensed to insert lines. And, Your Honor, I kept referring to expiration. In addition to expiration, I meant quality testing. That is included in the Arizona protocol. On this second point, counsel, I appreciate that clarification. On the second point, it sounds like you think that the federal standard is a broader ban with the folks who would be unqualified to carry out this procedure than the state. So my next question is, do you have any reason to think that the person who is actually going to be selected to do this task would not satisfy the Arizona standard? The problem is I don't know. As a matter of fact, they're not tricky questions. I'm just trying to figure out if your answer is just based upon what you perceive to be a delta between those two standards. Is that fair? Yes. So my position is they could not be qualified under the federal protocol. It's possible. It's possible. Okay. Did I get in your way on that? Let's talk about the third one. I wasn't sure I understood your position on the third one. As I read the two protocols, and again, I'm assuming the Arizona protocol is law for purposes of this question, there's a preference to a peripheral line, but the director of the Department of Corrections can order that a Venus line be used. How is that different than the federal procedure? The difference is that the federal, the BOP director can order the Venus access without the process by which he picks is not clear. Whereas in Arizona, it's a peripheral IV catheter, and then a central femoral line is only allowed to be placed if the person is specifically qualified to do so. I'm just focusing on placement right now, not qualifications. It seems to me that both protocols leave the eventual placement of the line up to the discretion of the head of the agency. Am I mistaken? I think taking into account what the qualified professional says with respect to where the line should be placed. So again, it goes back to qualification, and the licensed professional in Arizona is the one who has the input on it, whereas in Bureau of Prisons, that's not the case. Okay, so this is really derivative of number two then, right? It certainly is, Your Honor. To put it differently, if there were a licensed professional in the Bureau of Prisons doing this, this issue would go away too, wouldn't it? If the court specifically ordered that that licensed professional was the one who made the call, yes, Your Honor. Okay, I'm sorry, I didn't mean to interrupt you, Judge Grisham. No, I think I interrupted you. I just didn't get Mr. Amanoff's answer to that question about whether this issue is derivative of the second issue. Is that fair? I mean, it certainly relates to you, Your Honor, because it does depend on the qualified professional. So again, I think if the court wanted to copy the portions from the Arizona protocol about IV access and lines and training and qualified professionals, that would go a long way. Is it fair for me to be thinking about this as the federal protocol being broader? I think that your position is broader, and that's what causes you concern, because you view the state protocol as being more protective. But, of course, the federal protocol is encompassing judgments entered in many states. So is it the case – so it seems to me entirely possible that the way the execution will be carried out in Mr. Mitchell's case will comply with Arizona law, if that's a broader ban. And you're just concerned that it's possible that that's fair? Your Honor, yes. I mean, I think broad is one word for it. I think vague is another. What? Vague. I think the BOP protocol is incredibly vague, and a lot of it is that we don't know. And I just would like to go back to a point that Judge Hurwitz raised a few moments ago about the botched executions in Arizona. Part of the reason for those botched executions was because the director of Arizona's Bureau of Prisons was constantly changing the protocol, including during the warrant period and within days of execution. And there are several Ninth Circuit cases that have dealt with that. Dickens, Towery, and Lopez all dealt with that issue. And what has now changed in Arizona is this settlement agreement in the First Amendment case that we have filed and that we rely on quite extensively. And that settlement agreement ensures that the Arizona protocol will not be changed once a warrant is sought and the execution takes place. On the contrary, the Bureau of Prisons protocol does not offer any of that protection. So there can be all sorts of changes and vagaries that we don't know anything about. And just as Judge Hurwitz was warning me about the Arizona protocol and all the botched executions, that issue in Arizona has now been resolved. That issue in the Bureau of Prisons has not been resolved. Perhaps. Perhaps it's been resolved, and I hope we don't see another one like the last several. But I'm not sure that some of those weren't the fault of the licensed personnel. Your Honor, I think that's a fair point. I think everyone certainly makes mistakes. But the reason for these licenses is to try and minimize mistakes. And I think the Supreme Court has been very clear in cases like Bays, Glossip, Bucklew that certain protections are required under the Eighth Amendment. And that's why we have these detailed execution protocols. It simply does not exist in the Bureau of Prisons. But you're not making an Eighth Amendment attack on the Bureau of Prisons protocol in this case. What you're saying is you're making a statutory attack. You're saying that it doesn't correspond sufficiently to the Arizona protocol, correct? That's correct, Your Honor. I think a very specific thing was ordered by the district judge in this case in 2004. That order was actually drafted by the government. They didn't appeal that order. That is the order of this case. Excuse me, but could I ask you to circle back to the question I asked earlier? I'm not sure we gave you a chance to answer it, Mr. Amanoff. Is it your position that any deviation from the state protocol is sufficient? Any deviation? Or do we have to find a meaningful one, a material one, a substantial one? I looked in vain for this in your briefing. What is your position on that? So, Your Honor, my position is that they need to follow the Arizona protocol to the letter. I think a fair step back from that would be the protocol as it relates specifically to the execution itself. Okay, so go to that one if you would, because we were just talking about the four components that Judge Hurwitz hypothesized as really going to the execution itself. When we talk about those, the expiration date, the certifications for the person who places the IV line, the location of those four, as to those four, is it your position that any deviation is sufficient for you to satisfy the winter standard? Yes, Your Honor. I don't think they can deviate from any of them. Okay, so here's the difficulty I've got with that. Because you have to get a state, and so you have to show a likelihood of harm. And it seems to me in this particular situation that the harm your client faces is, and there's going to have to be a likelihood question too, but just focusing on harm, he is arguing that he will be harmed if he is executed in a way that deviates from what's going on. Yes, Your Honor. All right, so any deviation, that's what you're saying, would be sufficient? You've got to get a state. Yes, Your Honor. I think any deviation would be an illegal execution. It would be an execution that violates the order of the family. Even if it didn't increase the risk? Because they're both single-dose pentobarbital protocols with a lot of similarities. So it sounds like you're saying that even if you don't have to show an increased likelihood of harm in the sense of a more prolonged execution or perhaps additional pain or anything. Is that your position? Yes, Your Honor. I think a deviation from the Arizona protocol would be an unauthorized execution. Could I ask you, could I insert a question here? What's your best case for that? I followed up on the cases you cited in your brief. And they didn't seem to promise a more thorough execution. What do you think is the best case for saying there's irreparable harm for any deviation from the protocol? I think it's the D.C. protocol case itself, Your Honor. That case they issued an injunction. The D.C. Circuit Court of Appeals upheld that injunction. The government asked the Supreme Court to overturn it. The Supreme Court unanimously did not overturn it. Right, but that didn't directly address your issues. I was asking if there was any case that directly addressed the issue that you're now stating, which is any deviation from the Arizona protocol would be unauthorized execution of irreparable harm. Is there any case that supports that? I think the district court's order in the District of Columbia in the protocol case directly addresses that, Your Honor. But, counsel, that was an EPA claim, so it's really procedurally quite different, right? There the argument was that the government had exceeded its statutory authority, afforded it pursuant to the Federal Death Penalty Act by enacting a federal nationwide protocol. That strikes me as a very different case than the one we have here. Your Honor, I beg to differ a little bit. It was also about that, but the primary thrust of the injunction was actually whether the protocol itself was permitted under the FDPA. It was really a question of statute. I'm familiar with that argument. If you don't find that distinction to be meaningful, I don't want to take your time. I think I've interrupted Judge Okuda unintentionally, so let me. No. So my question was just whether there was a support, and if I understand counsel correctly, you're relying on the district court and the DCC for analyzing this EPA claim, and there's no other case that supports that proposition. Is my understanding correct? Your Honor, I mean, it's a bit tricky because, yes, that is my best case on it. And I'll tell you, there have only been these three executions that challenged this. There was a very long period of time when the government didn't seek to execute anyone. I know the court knows this because we were involved in litigation last year, but suddenly when the government came out and announced they had a new protocol and just started scheduling execution dates, this issue was not examined. And so this is the only time this has come to light, and the only case on it is out of DC. And what happened in DC was that they got an injunction. They were allowed a full appeal. The court took time to liberate. It took several months going through all the briefs, the full briefing, and then issued their decision. And I think the same thing should happen here. And, Your Honor, I see that I'm under five minutes. If there's questions, I'm happy to. Otherwise, could I reserve my time? Thank you. We'll hear from him. Good afternoon, Your Honors. My name is William Boyd. Excuse me, I'm having a hard time hearing you. Could you speak up or get closer? Much better. Thank you. I heard many questions from the panel about practicalities, and so I do want to turn to those directly. But I would preface it by saying I think I would have an alternative suggestion for the court if it's inclined towards the notion of a limited injunction, because that does really require the court to actually go through the really troubling questions about exactly what the FDPA means. Because I think the specific areas that have been identified here are areas where there is no actual conflict and there is not any practical problem. And I'm just going to start marching through the ones that my friend identified. With respect to disclosure of the testing of the drugs, the quality assurance reports have been publicly disclosed. They are in the publicly available administrative records in the District of Columbia, the reports themselves, dozens and dozens of pages on them. They were disclosed before his execution was even scheduled in July. So I don't think there's an issue there. That has been done. With respect to – Can I stop you there for a second? Is there a disclosure of the expiration date? The expiration date is not disclosed in that, Your Honor. However, the requirement that the government not use expired drugs has been disclosed and is very clearly stated. The government will not use expired drugs to carry out an execution. The government would never do that. And, in fact, in the March 10th guidance that Judge Kristen pointed out about, the guidelines for compounding and testing pentobarbital sodium for use in execution, it specifically provides that there will be quality assurance testing. The results will be verified prior to the execution, and that includes the expiration date has not passed. It's passed quality assurance testing conducted by at least one independent laboratory, and BOP has received a copy of that report confirming the same. So there is no controversy here about whether the government would use expired drugs. The government has disclosed its quality assurance testing, and as was noted by Judge Ikuda, that disclosure requirement also requires the request to have been made, and it wasn't. But we've done it anyway. It's publicly available. Counsel, may I have one follow-up? Forgive me for interrupting. Just one follow-up. The counsel made a gesture towards concern that he had that those standards perhaps had not been complied with in the three earlier executions. I don't think we have anything in our record to that effect. Is that right? There's nothing in our record. I'm not counsel out there, so I'm not. That answers my question. And if I could, is there anything pending in our district court action that I don't know about that raises that factor, the possibility that the March 10th guidelines was not complied with in the three earlier executions? No, Your Honor. The only motions before the district court are the ones that were brought up last year. And I think, again, given the procedural posture we're in, it is the defendant's burden by a clear showing to show there is going to be some likely harm here, real-world harm, and he hasn't done that. So in terms of testing, that's been disclosed. Whether compounded, yes, it will be compounded. It's been disclosed. It's on the public docket. The government will not use expired drugs. With respect to the IV access, I don't see a conflict here, and I don't see any reason that the court would need to enter into an injunction. It's just that the Arizona protocol provides, you know, it says either a peripheral line or a central line. I don't know what would be contemplated other than those. Those are the main ways of venous access. I asked BOP yesterday what were the means of venous access for the three prior executions. They were all peripheral lines. There has been no evidence provided to the court by the defendant that there was any problem with venous access or that there's a likelihood of harm from following the same procedures that occurred in the July executions. So I don't think there's an issue there. If the court would like that to be filed in a written document, we can do so as well, but I just don't think the defendant has met his burden to suggest there's any problem with the venous access that could lead to real-world harm because the procedures that Arizona requires are just standard venous access procedures, which are the procedures that the federal government has used in the previous executions. Mr. Voigt, your friend said that issue is really derivative, I think he agreed with my statement at least, derivative of the second issue he raised, which is that the Arizona protocol, assuming we're looking at that protocol, the Arizona protocol requires that the person who places the IV be certified to do so in the United States, and there's a requirement in the federal protocol that the person be qualified, but no licensure or certification requirement. Can you respond to that? Yes, Your Honor, and I would be happy, although I don't know the specific identity of the person, I'd be happy to file a notice if it would be useful, but the qualification requirement that is provided includes currently licensed physicians, nurses, EMTs, paramedics, phlebotomists, other medically trained personnel, so maybe there's some daylight there, but I think it's pretty vanishingly small, and I don't think there's been no public reports, no allegation, no evidence, no showing of any problem with venous access in the three executions that just took place last month, and so I think in order, even if there is some daylight between being an appropriately licensed person and an appropriately certified person, and I don't know medicine well enough to know if that's true, but it seems there would be a pretty narrow window. I don't understand your friend to be arguing a difference between certification and licensing. I think he's talking about the scope of their license, whether the scope of their license allows them to place intravenous lines. A barber might be certified by the state, but not licensed to place intravenous lines. So I'm asking, is your requirement practically the same as the state's, or is there a material difference? I mean, I think in candor you could technically read a difference. I don't know who would be a qualified, licensed medical person in one of these fields to place the line who wouldn't also meet that, but I guess my suggestion would be to the court that I could, obviously I don't think you want to be just relying on oral representations and oral arguments, because obviously I'm a different agency from BOP. I would suggest that I could file a document with the court this evening or tomorrow morning just confirming that, although we wouldn't disclose the identity, that the person who would set the IV lines would be certified to do so. I think that would moot out that issue and moot out all of the issues, because as I've described, the disclosure requirements have been set, and there's no likelihood of actual harm here. Well, I guess I'm asking the question, and I'm not at all suggesting this is what we should do, but if these are all things that you do and are going to do anyway, would the government object to us ordering that you conduct this execution that way? We would object to that sort of an order, Your Honor, and so I would propose sort of a different way of getting at the same point. The problem with issuing an injunction at this point is twofold. Number one, it's not the request that's before the court. The only thing the defendant has asked you to do is to stop the execution, so it would sort of be to respond to the object of the request. It's also, for the record, he didn't even ask for that in the district court. He just asked to stop his execution, and we think there's a big jurisdictional problem between that and the relief you're talking about. But secondly, in order to issue that injunction, you have to find that, in fact, we are required to comply with these parts of the Arizona Protocol, and so you have to reach all of these textual and legislative history arguments that we would suggest, given the abbreviated nature of the appeal, if the court can avoid doing, it would be appropriate to avoid doing. The narrowest ruling given the present procedural posture is probably the best, and I think that that would simply be, if the government can file a notice saying, we intend to use somebody who's certified, and we intend to use either a central line or a peripheral access, as we have before, and we've provided these notices, the defendant simply has this burden to show that there is any cognizable irreparable injury here, and so he can't get a stay, and that's the end of the motion. And that would be what we would suggest. Counsel, two or three times now you've said a notice that the person who will place the line is certified. It seems to me what you would need, and I really appreciate your creative problem-solving here, but it seems to me that what defense counsel would need is something to define the qualifications of the person, not just qualify, but person X, and I don't mean to suggest that you would identify the person, but the person scheduled to perform this task has the following certification, so that you can tell whether or not there is any daylight as to that person. Is that what you mean? Maybe that's what you mean. I understand your Honor's question, and I'm trying to think through it. I think that probably there still might be some privacy concerns, which are very serious about being sure we don't identify people. What I think the Arizona Protocol simply says is certified or licensed within the United States to place IV lines, and so I think if we could file a notice that simply said the person who will do it will be certified or licensed within the United States to place IV lines, that would avoid any potential daylight between the Arizona and federal protocols. I don't mean to belabor the point, but you're suggesting filing something that indicates that the person scheduled to do this task, perform this task, is somebody who would meet Arizona's protocol in this regard. Is that right? That would be my suggestion, and if I find out between now and tomorrow morning or whenever the court would like that, I have over-represented that, then the court, of course, can make its own decision. I'm just curious about what it is you're offering. Is the second part of this the notion that you would, in terms of line placement, location of the line? You're suggesting what on that point? Well, I don't think there is specifics in the Arizona Protocol other than that it be peripheral access or a central femoral line, and so I think it would, again, be something along the lines of the government will use peripheral access or a central femoral line. Again, this is outside the record, but I did ask BOP, and they said that all three were peripheral lines, and so I think it is just looking at the defendant's burden, I don't even know what he was saying, and that wouldn't be a peripheral or central line, so I don't think he could meet that under any standard. Mr. Amadoff talked, and we never asked him about, something about a saline flush. I guess in the Arizona Protocol it's used before the drugs are administered and the federal one is administered after. I wasn't sure I saw that anywhere except in the settlement agreement. Can you address that? Yes, Your Honor. The oral argument today is the first time the defendant has ever raised that, so I can't say that I've read the specifics of it very deeply. I think it is weight. He did not make any argument about the saline flush below. He didn't make it in his briefing here, and so I don't think it would be appropriate for the first time at oral argument, especially given the abbreviated posture, for him to talk about that. My reaction to it is, and again, I'm not a medical professional, but I think the saline flush is something that you do to clean out the line after you've provided the lethal agent, and so I don't know that that is something that he could show, that any difference between saline flushes when you receive the lethal dose of pentobarbital is going to lead to unconstitutional suffering or some other real world concrete non-speculative injury. The reason I ask the question is it takes us back to Judge Kristen's question, which I'm not sure Mr. Eminoff got a chance to address, which is this. Must the differences be material in the sense of their effect on the defendant, or is it simply enough that there is a difference? And let me give you a hypothetical. Let's assume that the Arizona protocol requires a certain strength of phenobarbital, and the federal government says, you know, we're worried that that's not enough to cause the death of the inmate quickly and without pain, so we will use phenobarbital and we'll cover all the other requirements, but we'll require a stronger dose. Would that be a departure from the FDRA? A few levels of responses, Your Honor. The first, of course, is to reinforce our view that... Of course, I understand your legal position. Fair enough. Take us down to where we are, which is that we're assuming at the moment that the Arizona protocol is prescribed by law, and so there's a difference. Arizona gives you less drugs, less strength drug than the federal one does. Would that, under your view of the act, would that be a departure? I think it's a challenging question to answer, Your Honor, because this question is exactly why we... And I'm not resisting the question, but this is the reason why we think that the FDPA can't mean this, because where would the textual basis for that come from? There's no, like, de minimis exception or something in the FDPA, and so it's really hard to see how that sort of an exception could come from anything other than recognition that the FDPA would actually be unworkable if it were analyzed in a way that... Let me change... I appreciate that answer. Let me change my hypothetical slightly. Let's assume that an Arizona statute prescribed the strength of the dose of female Barbital to be administered. Would you be required to follow that? Even though the federal government thought that it was insufficient in its strength? I think under the Judge Toddle view that it would, you know, that it would encapsulate those sorts of things, that would seem to be a difference. Under the Judge Rau view also, because she said, I'm bound by Arizona law and regulations. That's why I put it into a statute. Oh, I apologize, Your Honor, I didn't process that. Yeah, I think if it was in a statute, then probably under the Judge Rau view it would as well. Of course, I hasten to add here it's the same pentobarbital, same compounding, same 5 grams. So it is, of course, a hypothetical question for present purposes. I think the government's main reaction to the hypothetical is just that it reinforces, if there is some sort of de minimis exception, it's something that sort of has to be created and not actually seen in the law, which suggests that that interpretation of the FDAPA wouldn't be the right one. I want to be sure that I addressed all the practical questions. I would like to give you my pitch on why the FDAPA analysis under Judge Katz's view is the right one, but I want to be sure I've addressed all of the practical concerns that the Court has, because we really don't think that under what the defendant has identified he has in any way met his burden. I think it does bear noting that he actually has to jump four hurdles if he wants to get relief in this motion. First, he has to show that Judge Campbell's reasoning is wrong. Second, he has to show that the government's alternative reasoning of reading of the FDAPA is wrong. Third, he has to show that there is some real-world substantial likelihood of irreparable injury, not his execution. He can't challenge that, and we don't, for many reasons discussed, we don't think he's done that. And then fourth, even if he did that, he'd also have to show that the equities would favor a state of execution scheduled for next week. And so we don't think he meets any of those hurdles. Well, below in the briefing here, he has not engaged with the Arizona law about the protocol not being, it being specifically exempted from administrative rulemaking. It's not in the Arizona Administrative Code. It's not a part of the Administrative Procedures Act. Arizona law is very firmly in a separation of powers mode. I think it is perhaps one of, if not the most powerful separation of powers doctrines in Arizona. And so I don't think he's impeached Judge Campbell's reasoning under a Judge Rao-like analysis at all. And so he would fail that hurdle. We, of course, do believe that Judge Katz's analysis is the more persuasive. And my friend alluded to the text and the history and the practice. And I think our view is that all of those support the government's interpretation of the FDAPA as referring just to the top-line method. Everyone seems to agree, I think, that the 1790 Act was restricted to the top-line method. And so the question is, in 1937, how does this? Well, there was only one method. There was only one method in 1790. Well, I think there were fires. It's hard to read out of that a legislative determination that if other methods ever developed, nonetheless, this would be the top-line choice. I think I would disagree a little bit. I think executions by firing squad happened as well. And so I think that hanging wasn't the only possible method that could have been adopted. But I recognize, I think, as everyone would, that the statute could be read two ways. And so what I think the burden is, certainly in a preliminary injunctive posture, is to make a clear showing that Congress actually intended something that was much more dramatic of a change than the government's reading. And the change that he's suggesting is a very, very substantial one, and one that I don't think is favorable to defendants very much either. It's not only a change that sort of surrenders all federal authority over procedures to states, which, of course, has its own administrative problems. It's also a change that he's suggesting that divests the federal government of responsibility for its executions. Imagine that Leonard Mitchell was executed in 2014 under the same procedure that Joseph Woodward was executed in 2014. And the government's response would be, I mean, it's the Arizona Protocol, don't look at us. I think that his reading of the FDPA is one that has extraordinary broad implications, and implications that would not just make the federal death penalty unadministrable because some states keep their protocols secret or they don't update them, or it's possible some state officials might try to frustrate federal executions, but also because it would also divest the federal government of responsibility for its own executions. And I don't think that Congress meant that either. Well, except Congress did provide an alternative, which is turning over the defendant to the state and having them executed. Correct? I don't think that that is correct, Your Honor. The Congress said you could use state facilities, you could pay a state to use a state facility. But under the 1937 Act, it said that the marshal will be charged with inflicting the sentence. And we've also provided the BOP manual, which confirmed the marshal was in charge. And we know, in fact, that a number of executions under the 1937 Act did go forward in federal facilities. And so the 1937 Act diversified the method, as legislative history said, but we don't think that that Act in any way either required or contemplated that the federal government would give up control over its procedures. And I think that's further supported by the 1994 Act, which again said that the U.S. marshal will supervise this. It's hard to see how you could have a federal official supervising state officials. I mean, what if there was a difference between the state's view of what the protocol was and the federal government's protocol, and the federal official is supervising? I just think there are a lot of dragons lurking in the background of his interpretation of the SECA. That's one further reason for the court to take the most narrow way possible to resolve this. And the government does believe that the most narrow and restrained way under the present circumstances is just to say he hasn't shown a likelihood of irreparable harm in any deviation between the state protocol or state law and the federal protocol. And for that reason alone, the motion should be denied. And save for another day, an APA case when the court has the benefit of full briefing and arguments exactly what those vexing issues about what manner are sussed out. So on the irreparable harm point, his argument is that if you take his interpretation about the full procedure has to be used, that any deviation is an irreparable execution. What's your response to that? I think it shows that, I think number one, it struggles against the injunctive standard. I mean, Arizona requires you to use green and black labeling. The notion that a court would stop an execution because we were going to use red and white labels, I think very much struggles against the injunctive standard. And I think secondarily, it supports the government's view that the FDPA can't mean that. It can't mean that you have to follow all procedures because it would be unadministerable. I mean, the Arizona protocol talks about state log forms. What if a state didn't turn those over? What about a material change like Judge Hurwitz was identifying a stronger concentration of the execution drug? I think that we would sort of resist that there's any textual basis for that, Your Honor. If the court was going to create such a basis, I mean, certainly materiality would seem to be at least something for purposes of the injunctive standard that would be relevant. And so I think that you can probably avoid looking at whether there is some sort of de minimis exception, unwritten exception in the FDPA simply by looking at the injunctive standard where we're in. You have to show irreparable injury. And so just like in Winsor, this is where the Supreme Court said you can't get a preliminary injunction over an EIS, an environmental impact statement, when the sonar training is needed for national security. Even if there's a deviation in the law, that's not a basis for an injunction. And here we do think that given the very, very minor issues that have been identified, the lack of any actual conflict, the lack of any proof the government's going to do something that could cause unconstitutional suffering or pain or anything along those lines, and the strong equities that weigh in favor of the government's interest and the interest of victims and their families in carrying out the execution for a crime that happened 20 years ago, 19 years ago, we just think that on balance that is the best way to resolve this case, the narrowest way, which is to say whatever the FDPA needs, we have an articulated reference, and we're going to do what we can to stay. Unless there are any further questions from the court, the United States would respectfully ask the court to... I have a question. Oh, I thought I saw a hand. That was me. I just wanted to circle back and ask whether when you were suggesting that you would seek permission to file a statement verifying the certification requirement, did that extend to a statement assuring the defendant that a compound that will be used will not be expired? Absolutely, Your Honor. We have committed to that long ago, and I would certainly include that in any such statement. Thank you. We would ask that the defendant's motion be denied. Thank you, Your Honor. Thank you. You have some remittal time. Thank you, Your Honor. Can you hear me okay? I can. Yes. Thank you. Your Honor, we're in a slightly sort of extraordinary situation here. When the Federal Death Penalty Act was passed, it was the understanding of the head of the Marshals Service, the head of the Bureau of Prisons, the Chief of the Capitol Case Committee, and the Attorney General of the United States that the government cannot do what it's asking this court to let it do now. Then the government tried to get Congress to change the law. It tried it nine different times and was unsuccessful. Instead of following the law as it understood it to be, the government has now scheduled Mr. Mitchell for execution and turned the tables and claims that I need to now prove that the government is wrong. The fact of the matter is there was never a decision made on this before, and it's only happened now that the government doesn't want to follow the law, that it's simply claiming it can do this. Where it gets the authority for that is totally unclear to me and I think to anyone else. 3596 gives the Attorney General of the United States two responsibilities. One is to hold the defendant until it comes time for his execution. The second one is to release the defendant to the Marshals to then have the Marshals supervise implementation of the sentence as prescribed by the state of the law in Arizona. That is it. He doesn't have the right to come up with his own execution protocol, and he doesn't have the right to supplement whatever Arizona's execution protocol is. I think this is why the D.C. case seems to me to be quite different here, frankly, because there might be other state protocols out there where the delta is extreme. In this particular circumstance, which is the only one we're trying to get our arms around, it strikes me that the delta is not extreme. And I'm not here to tell you that there are not differences, to be sure, but I think your hurdle is really a high one if the government is willing to come in and say that, to use the terminology we were using earlier, that the federal requirements on these four points are a broader bandwidth, but they will certify that as to those four points, they're willing to comply with Arizona law. If that happens, how is your client harmed? How can you satisfy the winter standards? Your Honor, I think we are in a really dangerous situation here. We're talking about putting together a patchwork of an execution protocol eight days before the client's scheduled execution. That is not what anyone has contemplated should be the law. Arizona has a binding protocol. Now, when I listed things in the motion, I said some of the most significant differences are. They're not every single difference. I think there needs to be an evidentiary hearing to establish what exactly those differences are and how the Bureau of Prisons plans to implement this execution in a way that complies with Arizona law. Counsel, there's quite a number of components of the Arizona protocol that were argued in the district court. They're not even in the briefing to the Ninth Circuit. Your Honor, yes, I'm aware of that. I was somewhat limited on space given the motion requirements. I tried to get the most important points before the court. If the court would like to order full briefing, we would be very happy to brief this in depth. Again, this is what happened in the District of Columbia. They had an injunction, and then they had an opportunity to brief this in full and have an appeal in the ordinary course. I think the same thing should happen here. This speed to kill Mr. Mitchell is entirely of the government's own creation. The government's given us 28 days' notice of this execution, and we brought this motion as soon as we could. The district court found it timely, and now you are in the position of having to create a patchwork lethal injection eight days before the execution. With respect, counsel, and you've done a marvelous job, and I compliment you for it. The question in my mind is whether or not you've demonstrated that your client is likely to be executed in a way differently than the Arizona protocol requires with respect to the method of execution. What we've been asking about is if they use a non-expired drug whose compounding has been disclosed to you and use certified personnel, then how will it be different? Your Honor, I'm going to point you specifically to the Arizona protocol. The Arizona protocol specifically says all team members shall be currently certified or licensed within the United States to place IV lines. I don't know anything about the people at the Bureau of Prisons that tends to use. If they plan to file some kind of a statement, I mean, without any kind of judicial review, so we're just going to have a declaration from Mr. Boyd saying I'm wrong? The flip side of this is you're arguing that they're – you must be arguing that they are – it is probable that they will use somebody without such a certification because the federal protocol doesn't specifically require it. If they had said to Judge Campbell, as they are now saying to us, oh, no, we use somebody with such a certification, then wouldn't you have had some burden to show that they're not going to? That's the problem with litigating this eight days before in the appellate court. Like, if this was a hearing in district court, they could put on someone from the Bureau of Prisons that we would have the opportunity to cross-examine to figure what exactly that license and certification is and how that person is actually qualified to place these lines. Because as Your Honor well knows, in lethal injections, the problems tend to come when the line is not correctly placed. And what happens is the prison system then shoots a whole bunch of chemicals into someone's muscle and tissue that results in extreme pain and suffering. And that's what we're talking about here. When I made the point about the drugs failing quality control, Mr. Voights corrected me that it's public record. So I can say that the drugs that they were planning to use in December of last year failed testing protocols in early December. They did not disclose that until February of this year. So we really don't know what they're doing. And the fact of the matter is they don't either because they have just started doing this again, and there has been no judicial review of their protocol outside of these statutory interpretations. Your Honor, I think I have another point to make. And Your Honor, okay, sorry, one last thing. I know I'm out of time, and I'll say this just quickly. The government spent a lot of time talking about policy,  Their solution is to go to Congress and have Congress change this statute. They've tried that several times. They have failed each time. The solution now is not for them to do what they want and claim that there's going to be policy issues about this. It's very simple. This could be done very, very easily. And I'll give for an example the only two federal death sentences out of California where the sentencing order specifically says that the death sentence will be carried out in accordance with the state law of California. Now, California doesn't have a protocol. So then the judgment goes on, and it refers to the second part of 39-596, which then says that you can move the person and you will execute them in that state. It's not that hard for the government to follow this protocol. The FDPA also allows them to use state facilities. There is no problem. They can go to any death penalty state designated by the court and get it done. Discretion is specifically left in the hands of the courts, not in the hands of the federal government, and that's what the FDPA requires. I don't think the solution that the government is proposing of this court which is cobbling together a lethal injection protocol is appropriate or valid or allowed under 35-96. Unless there's further questions. Thank you, Your Honor. I respectfully request that you remand this case to the district court for a hearing of the issue and injunction against this execution. Thank you very much. The case of the United States of America v. Lesmond Mitchell is submitted. And we are adjourned for this session. This court for this session stands adjourned.
judges: Ikuta, Christen, Hurwitz